IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| JAMES M. PACKARD, | ) |
| Plaintiff, | ) No. 04 C 5130 |
| v. | ) Paul E. Plunkett, Senior Judge |
| TCF NATIONAL BANK and DANIEL HOFFMAN, | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

James Packard ("Plaintiff") has filed a lawsuit against TCF National Bank ("Bank") and Daniel Hoffman alleging reverse gender discrimination under Title VII of the Civil Rights Act of 1964 ("Title VII"), as well as the state law claim of intentional interference with business relations. Before the Court is Defendants' Federal Rule of Civil Procedure ("Rule") 56 motion for summary judgment. After careful review of the evidence, we conclude that Plaintiff has failed to demonstrate there are triable issues of material fact and, accordingly, Defendants' motion for summary judgement is granted.

## Facts

Unless otherwise noted, the following facts are undisputed. Packard, a white male, was an employee with the Bank from September 16, 1996 through April 11, 2003. Plaintiff last was employed as a branch lending manager and was supervised by Hoffman. While Plaintiff was managing a branch in Schaumburg, Illinois, one of the loan processors, Jolynn Adkins, reported

1

directly to him. Subsequently, Adkins and Plaintiff held the same managerial position at different branches. (Defs.' Rule 56.1(a)(3) Statement of Facts ¶ 7.)

*The First Harassment Complaint*

In mid-February 2002, while stationed at different offices but both in the branch lending manager position, Packard called Adkins and told her that he was thinking of her while buying a gift for his wife and that he felt close to her because of the advances that she had initiated toward him just a few weeks earlier on a business trip. (*Id.* ¶¶ 9, 10.) On the trip, Adkins asked Packard to become intimate with her, but Packard ultimately declined.

A few days later on February 17, 2002, Packard telephoned Adkins a total of three to five times all in one day. (*Id.* ¶ 13.) At that point Adkins complained to her boss, Tom Torossian, about the calls and Torossian informed TCF's Human Resources Manager, Judy Bradbury. Bradbury was advised that Packard called Adkins and told her he could not eat or sleep and he wanted to meet with her but did "not want to have sex with her." (*Id.* ¶ 15.) In a conversation with Bradbury, Adkins requested that the phone calls from Packard cease. On February 19, 2002, Bradbury met with Packard and explained to him that Adkins had filed a sexual harassment complaint against him. Packard then admitted that, just the previous day, he had called Adkins five to seven times, but explained he only wanted to be friends with her. Packard was then required to take a sexual harassment class, but his employment status was otherwise unaffected. However, Bradbury instructed Packard that from that point forward, he was to have no further contact "whatsoever" with Adkins and, if he did, he would be terminated. (*Id.* ¶ 18.); (Packard Dep. at 40.)

In February 2003, following a conversation with Hoffman regarding his low performance and production, Packard filed a complaint about Hoffman with Bradbury. Although Packard admitted to Bradbury that his sales were down and that, previously in 2001, he was also advised that his work was not up to par, he alleged that Hoffman harassed others and erroneously directed Plaintiff to change the customary procedure of handling of loan payoff letters. (*Id.* ¶¶ 4, 20, 21, 22.); (Pl's Rule 56.1(b)(3) Statement of Facts in Opp'n to Defs.' Motion for Summ. J.¶ 19.) Plaintiff reported Hoffman's directives to upper management and contends that this is when Plaintiff's problems with Hoffman began. In 2001, Plaintiff was told in his performance review that he needed to make more contacts and should be working longer hours.

*The Second Harassment Complaint*

On April 2, 2003, as part of his job as a branch lending manager, Packard was dropping off loan files at TCF's Lombard branch. Adkins, as part of her job as a branch lending manager at a different branch, was also dropping off her loan files that day. Once Packard recognized Adkins in the parking lot, he walked "at a quickened pace" behind her and although he did not recall whether he said her name aloud, he concedes that he thought her name and it is possible that he called out her name. (Defs.' Rule 56.1(a)(3) Statement of Facts ¶ 30.) Adkins told Torossian about the uncomfortable situation she faced in the parking lot and Torossian, in turn, informed Bradbury of the incident. On April 3, 2003, Bradbury spoke with Adkins and confirmed the April 2, 2002 incident.

On or about April 9, 2003, at Bradbury's request, Hoffman and Torossian met with Packard to ask him about the April 2, 2003 incident. (*Id.* at 29.) At that time, Packard admitted that he

3

walked at a quickened pace behind Adkins and thought he said her name to himself, but may very well have said it aloud. Hoffman, accordingly, suspended Packard for violating the admonition that he have "no contact whatsoever" with Adkins. (Packard Dep at 40.) Even though Plaintiff admits he was walking behind Adkins, he denies "following" her. Bradbury did not personally speak with Packard regarding the incident because he admitted to quickly walking behind Adkins and concedes that he thought her name aloud. (*Id.* ¶ 51.) Bradbury contends that because Packard did not deny the substance of the allegations upon which she based her decision, she had sufficient information to determine, without further investigation, that termination was appropriate. Packard disagrees and claims that he did deny *following* Adkins and told Hoffman that he met her only by coincidence, which means he did deny the allegations. (Defs.' Rule 56.1(a)(3) Statement of Facts ¶ 39.)

Generally, Bradbury and her human resources team determine investigation procedures for all sexual harassment claims alleged by both male and female employees. After the investigation and at Bradbury's direction, on April 11, 2003, Hoffman and Torossian again met with Packard and explained to him that because of harassment, or because he violated Bradbury's directives to not have contact with Adkins, he would no longer be employed with TCF. (Pl's Resp. in Opp'n to Defs.' Motion for Summ. J. ¶ 34.) However, it is undisputed that Hoffman was not involved in the actual decision to terminate Packard. (*Id.* ¶ 43.) During the conversation with Hoffman and Torossian, Packard stated that he understood that Adkins could have been "terrified" that day because he did walk at a quickened pace after her. (*Id.* ¶ 36.)

After being fired, Plaintiff telephoned Bradbury and she affirmed that Packard was fired for harassment. At that time, Packard told Bradbury that he loved Adkins and understands how he could have frightened her by walking behind her and possibly saying her name aloud. Packard again called

Bradbury on April 14, 2003, to inform her that he believed that Hoffman was biased against him because he had previously complained about him. However, all parties agree that Hoffman never knew of Packard's complaints about him. (*Id.* ¶ 38.) Packard also told Bradbury that he wished to file a complaint against Adkins because he did not follow her, they were merely in the same parking lot and he was behind her by coincidence. (*Id.* ¶ 39.) In yet another telephone call to Bradbury, Plaintiff said that Hoffman was biased and retaliated against him and that he also wished to file a complaint against Adkins for filing a false harassment claim against him. (*Id.* ¶¶ 34-35.) Packard claims that Adkins, who was similarly situated to him, was treated more favorably, in that her sexual harassment complaints against Packard were investigated and believed, but his false allegation complaints against her were not. (*Id.* ¶ 44.)

## Legal Standard

To prevail on a summary judgment motion, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, [must] show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). At this stage, we do not weigh evidence or determine the truth of the matters asserted. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). We view all evidence and draw all inferences in favor of the non-moving party. *Michas v. Health Cost Controls of Ill., Inc.*, 209 F.3d 687, 692 (7th Cir. 2000). Summary judgment is appropriate only when the record as a whole establishes that no reasonable jury could find for the non-moving party. *Id.*

In addition, where "undisputed facts give rise to disputed inferences," summary judgment is not appropriate. *Harley-Davidson Motor Co., Inc. v. Powersports, Inc.*, 319 F.3d 973, 989 (7th

Cir. 2003) ("the choice between reasonable inferences from facts is a function of the fact-finder"). *See also Ramirez v. The Nutrasweet Co.*, 1997 U.S. Dist. Lexis No. 95 C 0130, 17111 at *7 (N.D. Ill. Oct. 27,1997) ("if the evidence presented by the parties is subject to conflicting interpretations, or if reasonable minds could differ as to its significance, summary judgment must not be granted") (citing *O'Connor v. Chicago Transit Auth.*, 985 F.2d 1362, 1366 (7th Cir. 1993)).

## Discussion

Title VII prohibits employment discrimination on the basis of race, color, religion, sex or national origin. 42 U.S.C. § 2000e-2 (1994). To prevail on his reverse gender discrimination claim, Plaintiff must either present direct evidence of Defendant's discriminatory intent or prove that intent indirectly, following *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973); *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996). In order to establish direct evidence, there must be a virtual admission by the decision maker that the action against the employee was predicated upon the "prohibited animus." *Haywood v. Lucent Tech., Inc.*, 169 F. Supp. 2d 890, 907 (N.D. Ill. 2001); *see also Foster v. Arthur Andersen, LLP.*, 168 F.3d 1029, 1035 (7th Cir. 1999). Direct evidence claims are rare because they essentially require the decision-maker to admit that she acted based upon the prohibited animus. *Cerutti v. BASF Corp.*, 349 F.3d 1055, 1061 (7th Cir. 2003). Absent such direct evidence or clear acknowledgment of harassment, courts will examine the claim under the *McDonnell Douglas* burden shifting analysis. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

Under this burden shifting method, a plaintiff must first establish a prima facie case of discrimination. *Chiaramonte v. Fashion Bed Group*, 129 F. 3d 391, 396 (7th Cir. 1997) (citations

omitted). In general, to do so, a plaintiff must establish that: (1) he is a member of a protected class; (2) he was meeting his employer's legitimate employment expectations; (3) he suffered an adverse employment action; and (4) similarly situated individuals who are not in his protected class were treated more favorably. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885-86 (7th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 801). In a reverse gender claim, however, we apply a modified version of this test. *Gore v. Indiana Univ.*, 416 F.3d 590, 592 (7th Cir. 2005). Under this approach, the first prong requires that Plaintiff show "background circumstances that demonstrate that a particular employer has reason or inclination to discriminate invidiously against [men]" or some evidence casting suspicion on the employer's actions and conduct. *Id.* (internal quotation omitted). The ultimate burden to prove discrimination always remains with the plaintiff. *See Sattar v. Motorola*, 138 F.3d 1164, 1169 (7th Cir. 1998). If a plaintiff has successfully demonstrated these elements, a rebuttable presumption of discrimination is established. *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 885–86 (7th Cir. 2001) (citing *McDonnell Douglas*, 411 U.S. at 801). *Id.*

The burden of production then shifts to the defendant to offer a legitimate, non-discriminatory reason for taking its challenged employment action. *Id.* If the defendant carries his burden, the plaintiff must then demonstrate that the defendant's legitimate reason was actually a guise for discrimination. *Id.* (referencing *Stewart v. Henderson*, 207 F.3d 374, 376 (7th Cir. 2000)); *see Von Zuckerstein*, 984 F.2d at 1472. If the plaintiff is able to show that the defendant's explanation was pretextual, then he will have a viable claim for discrimination. Thus, to defeat Defendants' motion for summary judgement, Plaintiff must either present some direct evidence of Defendant's discriminatory intent or, using the burden-shifting method of proof, present indirect

7

proof of discrimination as articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Cheek v. Peabody Coal Co.*, 97 F.3d 200, 203 (7th Cir. 1996).

Defendants first claim that Plaintiff cannot establish a prima facie reverse gender discrimination case, arguing there is no evidence to show that TCF routinely discriminates against men or that there is proof to show that its motives are suspect. TCF has harassment training and policies in place and routinely employs men and women. There is no proffered evidence to show that it harbors any gender animus in its hiring, employment or termination procedures. Second, Defendant points out that Plaintiff was hardly meeting his employer's expectations. Packard admits that at least on two separate occasions, he was warned by his supervisor that his production output was unsatisfactory, thus demonstrating that he may not have been meeting his employer's expectations. Finally, Defendant claims that although there was clearly an adverse employment action, Packard has also failed to show similarly situated individuals that were treated more favorably. In disciplinary cases, a similarly situated person is someone who has the same title or qualifications, the same supervisor, and same misconduct as the employee who received adverse treatment. *Radue v. Kimberly-Clark Corp.*, 219 F.3d 612, 617-618 (7th Cir. 2000). Packard claims that Adkins was similarly situated. However, though her job position was the same, her conduct was not. Unlike Plaintiff, Adkins did not place numerous phone calls on a daily basis leaving Packard feeling uncomfortable, nor did she tell him that she was thinking of him while buying gifts for others or that she could not eat or sleep without seeing him. Plaintiff has produced no evidence that any similarly situated branch lending managers were treated differently by TCF for the same misconduct committed by Packard. Simply stating that TCF treated similarly situated females differently,

without providing any such proof is not sufficient to state a prima facie case. Therefore, Plaintiff has not established a prima facie case for reverse gender discrimination.

Defendants next contend that Plaintiff has failed to show Plaintiff's termination was pretextual as required by the *McDonnell Douglas* burden-shifting analysis. To demonstrate pretext, plaintiff must show that defendant's articulated reason for the demotion is "unworthy of credence." *Gordon v. United Airlines, Inc.*, 246 F.3d 878, 888 (7th Cir. 2001). "[P]retext means deceit used to cover one's tracks." *Wells v. Unisource Worldwide, Inc.*, 289 F.3d 1001, 1006 (7th Cir. 2002) (citing *Grube v. Lau Indus., Inc.*, 257 F.3d 723, 730 (7th Cir. 2001)).

Here, Plaintiff was fired because he admittedly quickened his pace behind Adkins and said her name aloud, all this after he was warned that he would be fired if he would have further contact with her. (Packard Dep. at 49, 51, 53.) This articulated reason for termination does not suggest discriminatory animus. Though Defendant's investigation of the incident arguably was inadequate and its record keeping rather sloppy, there is no evidence to show that Defendant's reason for termination was unworthy of credence or deceitful. Analyzing under the burden shifting method, Plaintiff has not established a prima facie case of harassment, nor has Plaintiff made a showing that his termination was pretextual. Accordingly, summary judgement would not be appropriate.

However, Packard makes no attempt to establish a prima facie case of discrimination or to engage in the *McDonnell Douglas* paradigm. Instead, he claims to be able to establish reverse gender discrimination through the direct method. The direct method establishes discrimination through direct evidence or circumstantial evidence. The standard for alleging discrimination this way is quite high; "[d]irect evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption." *Rudin v. Lincoln Land*

*Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (stating there must be evidence showing an employer has outrightly said that, for example, a promotion is not occurring because the candidate is not white or because the because the candidate is a woman.); *Volovsek*, 344 F.3d 592, 599 (7th 2003). In other words, there must be a statement, admission or smoking gun that shows that gender had a part in Packard's termination. *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir.2003).

However, as Judge Posner has explained, absent this smoking gun, Plaintiff's cause is not necessarily lost. A plaintiff may still prevail in the direct method by presenting circumstantial evidence. Proving a discrimination case circumstantially allows the trier of fact "to infer intentional discrimination by the decision maker." *Rogers v. City of Chicago*, 320 F.3d 748, 753 (7th Cir. 2003). Discrimination can be proved circumstantially through "ambiguous statements, suspicious timing, discrimination against other [male] employees, and other pieces of evidence none conclusive in itself but together composing a convincing mosaic of discrimination against the plaintiff." *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994).

Having no overt statement of direct, discriminatory motive, our task here then is to examine whether all the circumstantial evidence, viewed in a light most favorable to Packard, would compel a rational jury to find that there was evidence that directly pointed to a discriminatory reason for his termination. Packard claims he has established such a mosaic because: (1) Bradbury spoke with Adkins, but did not speak with him directly regarding the second sexual harassment complaint; (2) Bradbury did not consider the surveillance tapes prior to firing Packard; (3) Bradbury made excuses for not being able to personally handle all employee relations matters; (4) Packard had complied with the no contact order prior to April 2, 2003; and (5) Bradbury re-characterized Plaintiff's separation status from TCF as a voluntary resignation versus a termination. Packard claims that these facts,

10

collectively, establish discrimination. We disagree. To show discrimination in this way, Plaintiff must essentially prove that he would not have been fired if he were a woman. *Troupe*, 20 F.3d at 738. Plaintiff must establish that these separate facts and pieces of evidence collectively point to an impermissible motive behind Plaintiff's termination. *See Rudin*, 420 F.3d at 720 (explaining that the admission that a university official was under pressure to hire a minority candidate created the mosaic); *See also Volovsek*, 344 F.3d at 899 (holding circumstantial evidence adequate because plaintiff heard derogatory comments about women and there was evidently a question as to the impact that the animus towards women had on her non-promotion.)

First, the fact that Bradbury did not speak with Packard directly does not point to discriminatory conduct. Bradbury made sure that Packard's manager got his account of the parking lot scenario before she made her determination that he would be fired. Second, because Packard admitted that he quickened his pace behind Adkins and thought her name aloud, Bradbury relied on this information and concluded that termination was in order. With this admission, Bradbury can hardly be faulted for not looking at video tapes or speaking with Packard herself. Once Packard admitted to having some sort of contact, Bradbury felt termination was appropriate. Third, whether it was or wasn't Bradbury's handling of the incident cannot be used to infer gender animus. Bradbury stated that she and two other human resources employees handled all employee relations and that in managing thousands of employees, it was not unusual for her to rely on the managers to assist in investigations. (Bradbury Dep. at 113.) Fourth, despite the fact that Plaintiff followed the no contact provision for one year, the fact remains he did violate the directive in a way which frightened Adkins. Packard was clearly told that if he had contact with Adkins, he would be fired. Whether his being in the same parking lot was coincidental or not, Packard's admission that he

11

walked at a quickened pace behind Adkins and "thought her name aloud" is, per se, a violation of the strict directive imposed upon him. Packard violated Bradbury's warning and therefore his termination should not have been a surprise. Fifth, Packard also points to the reason for his separation as being suspicious because, in his personnel file, he was initially categorized as being fired, but then was later labeled as having voluntarily quit. The change was made, according to TCF, because Packard began to pack up his belongings before the termination was issued, so he was officially deemed to have resigned. We are unable to find anything resembling discrimination in this conduct.

Discriminatory intent can also be inferred through circumstantial evidence when, for example, similarly situated female employees are regularly treated more favorably than their male counterparts or when a plaintiff, despite being qualified for a position, was passed over for a job for an unconvincing reason. *Rudin*, 420 F.3d at 720-21 (internal citations omitted). That circumstantial evidence, however, "must point directly to a discriminatory reason for the employer's action." *Adams v. Wal-Mart Stores, Inc.*, 324 F.3d 935, 939 (7th Cir.2003).

Plaintiff asserts that the circumstantial evidence shows that Defendant treated employees differently because of gender, and from this we should infer Defendant directly discriminated against Plaintiff because he was male. Specifically, Packard complains his false claim allegations were not granted the same consideration and investigation as Adkins' sexual harassment claims. However, Plaintiff has also offered no evidence to show that Defendant has discriminated against other employees or that similarly situated females were treated better. Plaintiff fails to prove that TCF routinely treated men differently than women or that TCF regularly punishes men for sexual harassment without punishing women for the same conduct. This is not a case of arbitrary firing.

Plaintiff received a clear warning that he was to have no contact "whatsoever" with Adkins or termination would result. There was no ambiguity in Bradbury's directive and Plaintiff should have expected the termination once contact was made.

Further, the Seventh Circuit has affirmed that employees accused of complaints of misconduct and complaints of sexual harassment are not considered to be similarly situated. *Spearman v. Ford Motor Co.*, 231 F. 3d 1080, 1086 (7th Cir. 2000). There is no evidence that any sexual harassment claims were made against Adkins, nor is there any evidence to convince us that Packard's false allegation claims were equitable to Adkins' sexual harassment claims. Plaintiff's evidence fails to carry his burden to show the circumstantial evidence presents an issue of triable fact as to whether his termination was motivated by gender.

A jury could question whether TCF's harassment investigation procedure was consistent and whether Packard called Adkins name aloud or just thought it aloud. However, haphazard record keeping and management inconsistencies alone do not show an adverse employment action resulted from discriminatory intent. *See Dunn v. Nordstrom*, 260 F.3d 778, 787 (7th Cir. 2001). Also, Bradbury's decision to terminate Packard did not hinge on whether or not the name was called out loud. Rather, Bradbury based her decision to terminate upon the premise that Packard did quicken his pace after Adkins and "thought her name out loud." This was enough for Bradbury to determine that Packard had violated the no contact with Adkins admonition. In this case, these factual questions are not material and thus, because there was a valid, non-discriminatory reason for termination and because Packard has failed to present evidence that Bradbury acted with discriminatory animus, he cannot survive summary judgment based on reverse gender discrimination. Accordingly, as to Count I, Defendant's motion for summary judgment is granted.

As to the interference with business relations claim, Defendants state that summary judgement is appropriate because Plaintiff again fails to establish a prima facie case. To establish an intentional interference with business relations claim, Plaintiff must show that: (1) he had a reasonable expectation of continued employment; (2) Defendant knew of Plaintiff's expectancy; (3) Defendant interfered for the purpose of defeating this expectancy; and (4) Plaintiff incurred damages as a result of Defendant's interference. *Vickers v. Abbott Lab.*, 308 Ill. App. 3d 393 (1st Dist. 1999).

Here, we may infer that Packard did expect to be employed, Defendant knew of such an expectation, and Packard was damaged by his termination. Therefore, the only element we need consider is the third prong of the test. In *Vickers*, the court stated that to sufficiently establish the third prong of the prima facie case, Plaintiff must show that Defendant's interfering conduct was unjustified and malicious. *Id.* at 411. Apparently the idea here is that Defendant somehow caused Plaintiff to be in a "tempting" situation, one that would induce him to violate the rules. However, where it is undisputed that Defendant did not participate or was involved in any way with the termination, that Defendant cannot be liable for the tortious or intentional interference claim. *See Goetzke v. Ferro Corp.*, 280 F.3d 766, 780-81 (7th Cir. 2002); *Estate of Parks v. O'Young*, 289 Ill. App. 3d 976, 989-90 (1997).

Plaintiff claims that Defendant created an elaborate scheme to ensure that he and Adkins were placed in the same area at the same time to lure Plaintiff into breaking the no contact covenant. However, Plaintiff has offered no evidence to support the planning or execution of such a plot. Furthermore, it is undisputed that Hoffman had no say in whether Packard was terminated. (Pl's Rule 56.1(b)(3) Statement of Facts in Opp'n to Defs.' Motion for Summ. J. ¶ 43.) Therefore, as a

14

matter of law, Hoffman cannot be liable for intentional interference with Packard's business relations. Thus, as to Count III, summary judgment is also appropriate.

## Conclusion

Based on the foregoing, Defendants' motion for summary judgement is granted. This is a final and appealable order.

**ENTER:**

_____
**UNITED STATES DISTRICT JUDGE**

DATED: DEC 9 - 2005